IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY, an Ohio corporation,<br><br>Plaintiff,<br><br>v.<br><br>SPECTRUM DEVELOPMENT CORPORATION, a Utah corporation, PAUL BURNINGHAM, an individual; KENT BURNINGHAM, an individual; and TODD FICETO; an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:11-cv-0015-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court are The Cincinnati Insurance Company's ("Cincinnati") Motion for Partial Summary Judgment, (Dkt. No. 67)[1] and Objection to Affidavit of Jeff Banman (Dkt. No. 81). Also before the court are Todd Ficeto's ("Ficeto") Motion for Partial Summary Judgment, (Dkt. No. 69) and Motion to Strike Affidavit of Paul Burningham (Dkt. No. 82). The court held oral argument and took the matters under advisement. The motions are now ready for decision.

## BACKGROUND

This case concerns a dispute over whether there is coverage under a commercial general liability and umbrella insurance policies for certain damages awarded in an arbitration proceeding. On July 13, 2006, Spectrum Development Corporation ("Spectrum") entered into a

---

[1] Although Cincinnati styles its motion as one for summary judgment, its pleadings state that it is only seeking summary judgment "with respect to its duty to indemnify Spectrum for the arbitration award." (Dkt. No. 67, ¶ 4).

contract with Ficeto to act as the general contractor for the construction of a home in Park City, Utah. Pursuant to the agreement, Spectrum was required to maintain a general liability policy with coverage of $2 million throughout the entire construction process. Spectrum obtained a General Commercial Liability Policy (No. CAP 5897418) ("GCL") from Cincinnati with coverage from December 24, 2006 to December 24, 2007, subsequently renewed from December 24, 2007 to December 24, 2010. Spectrum later purchased an Umbrella Policy (No. CAP 5897418) from Cincinnati with an effective date of February 10, 2009. Spectrum was the only named insured. Both policies were cancelled on September 4, 2009 for non-payment of premiums.

While the contract specified that the construction was to be completed within twelve months for a total sum of $2,181,450.00, there were multiple delays and cost overruns. After two years from the contract deadline, with $3 million dollars already paid to Spectrum, the project was still far from being complete. Ficeto hired Preston Campbell and his company Go West Development, LLC ("Go West") on January 5, 2009 to replace Spectrum as general contractor and informed Spectrum by a January 7, 2009 letter that he was "[terminating] your contract and related services immediately." (Dkt. No. 67-2, p. 82–83). The letter also noted that "in the circumstances, . . . it would be unreasonable to . . . grant you any right to cure [your performance]." *Id.* While Spectrum offered to remedy damages on the project, Ficeto declined to have Spectrum do any further work.

Ficeto filed an Arbitration Demand on January 6, 2010 against Spectrum and its owners, Paul and Kent Burningham. Cincinnati provided a defense to Spectrum in the arbitration action under a reservation of rights. The arbitrator awarded Ficeto $432,350.83 for past construction defect repairs and $540,702.00 for future repairs of construction defects; however, as Spectrum

has gone out of business, Ficeto has been unable to collect on the judgment. Ficeto acknowledges that certain damages included in the award do not fall within the scope of either the GCL or the Umbrella policies. Ficeto has also conceded that the cost of redesigning and building a roof overhang and the cost of properly reinstalling the exterior stone veneer are not covered by the policies. (Def.'s Opp., p. 60 [Dkt. No. 78]). Thus, the only damages presently at issue are (1) water damage to the interior walls and floors of the home, (2) water damage to the main deck, and (3) the cracking of the basement slab.

*Damage to the Interior Walls and Floors.* Water damage to the interior of the house was caused in part by leaks from the roof and the point where the main deck was attached to the home. On January 12, 2009, on Campbell's first day on the job, he observed water leaking into one of the kid's bedrooms, with the drywall completely soaked to the point where it all had to be taken down. After pulling wet bats of insulation out, he noticed that mold was already starting to grow inside the wall. Campbell also observed a half inch of water on the floor. Ficeto claims coverage for the cost of for repairing the walls and flooring damaged by the leaks resulting from defective work on the roof and deck.

*Damage to the Main Deck.* The main deck, which had a concrete floor, was damaged by water as a result of failures in the waterproofing on the deck itself. The deck also had significant structural defects unrelated to the water damage. Gary Bezzant, the concrete subcontractor, testified that he was instructed by Spectrum to pour the concrete on the deck despite the fact that there were no scuppers in place because the waterproofing subcontractor had stated that they would be able to install them afterwards. A scupper is an opening placed in a weather exposed deck to allow water to drain from the deck. Without scuppers or with improperly placed scuppers water can puddle up and may cause damage to the deck and surrounding property. Several weeks

after Bezzant poured the deck, he observed scuppers just slid in place with no caulking and water leaking into the walls and the floor below. On his first day, Campbell also noticed leaks on the outside of the deck, with icicles eight to twelve feet in diameter and ten to twelve feet long hanging from the arches. The icicles began from within the rock on the outside of the house, suggesting issues with the waterproofing of the deck. By using a hose, Campbell determined that the water was coming from the flashing at the deck surface pony wall connection. The wall underneath the cap had also started to rot away.

*Damage to the Basement Slab.* The concrete slab in the basement was poured in February, 2007 by Bezzant & Sons. Some settling occurred immediately after pouring and as the concrete was being troweled. The evidence may support a finding that this settling was caused by improper compaction of the soil, by pouring of the concrete over wet or frozen base fill, or by a lack of rebar. On the present record, the evidence is insufficient to conclude as a matter of law which of the possible causes resulted in the damaged basement slab. When Bezzant measured the basement slab in the summer of 2007, it had sunk about an inch to an inch and a half lower than where it had originally been placed. Richard Butz, who had been the exclusive building inspector on the Ficeto home as of March 3, 2009, wrote in his building inspection report dated May 20, 2009 that there was new cracking all over the basement floor. Ficeto contends that the additional cracks were caused because of Spectrum's failure to install adequate drainage to allow for the spring flows, resulting in water running beneath the concrete floor.

The water running beneath the concrete floor was discovered when Reliable Builders ("RBI"), one of Go West's subcontractors, was installing baseboard in a basement bathroom and noticed a puddle of water growing around the toilet drain pipe.[2]  Since the wall behind the toilet

---

[2]  Cincinnati has filed an objection against the affidavit of Jeff Banman. (Dkt. No. 81). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in

and the wall in the back of the tub were completely dry, it appeared that the water was coming up through the concrete where the toilet pipe penetrated the floor. Because some of the plumbing for the tub had been installed in the wrong place, a plumber had broken a hole in the concrete to reroute the drain. During March and April of 2009, Jeff Banman, RBI's owner, personally observed that the broken aggregate in the hole was wet and remained wet in subsequent inspections. Banman verified that there was a gap between the bottom of the concrete floor and the soil underneath. Cincinnati argues in opposition that the sole cause of the cracking to the basement slab is the improper compaction and pouring over frozen ground. The arbitrator found that the concrete floor continues to settle up to the present.

Cincinnati is seeking declaratory judgment that the GLP does not cover the arbitration award and that all damages fall outside of the Umbrella policy. Ficeto in turn contends that there is coverage under both policies and that there are no applicable exclusions.

## ANALYSIS

### I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational [factfinder] . . . could find in favor of the non-moving party based on the evidence presented." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000). "Only disputes over facts that might affect the outcome of the suit

evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). The statement that Banman personally observed the hole that had been made in the basement slab on more than one occasion, together with his position as the owner and president of RBI, provide sufficient foundation for the statements in ¶¶ 11–15 as to how the hole came to be there. The statements in ¶¶ 7, 10, 19 do not have sufficient foundation to establish that Banman had personal knowledge of those assertions, and are therefore inadmissible. The statements in ¶¶ 17, 30, 31, 34 contain inadmissible hearsay. Finally, the statements in ¶¶ 22, 24, 26, 27 are inadmissible because Banman's opinions as to the age and cause of the cracks are based on "scientific, technical, or other specialized knowledge" within the scope of an expert witness. FED. R. EVID. 701.

under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## II. Burden of Proof

"The burden of establishing coverage under an insurance policy is on the party who asserts that a loss comes within the coverage of the policy, even when the insurer commences a declaratory action to resolve the question." *Cincinnati Ins. Co. v. AMSCO Windows*, 921 F. Supp. 2d 1226, 1233 (D. Utah, 2013); *see also LDS v. Capitol Life Insurance Co.*, 765 P.2d 857, 859 (Utah 1988). Once the insured makes a prima facie case that the loss falls within the scope of the policy, the burden shifts to the insurer to prove that the claim is not covered because of an exclusion. *Id.*

## III. Construction of Policy Language

Utah courts "interpret words in insurance policies according to their usually accepted meanings and in light of the insurance policy as a whole." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685 (Utah 1999). Any ambiguous or uncertain language that is fairly susceptible to different interpretations should be construed in favor of coverage. *United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 522 (Utah 1993). "A contract may be ambiguous because it is unclear or omits terms or, . . . 'if the terms used to express the intention of the parties may be understood to have two or more plausible meanings.' However, policy terms are not necessarily ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests." *Alf v. State Farm Fire & Casualty Co.*, 850 P.2d 1272, 1274–75 (Utah 1993) (citations omitted). In order to exclude certain losses from coverage, an insurer must use language which "clearly and unmistakably communicates to the

insured the specific circumstances under which the expected coverage will not be provided." *Id.*
at 1275.

**IV. General Commercial Liability Policy**

 **A. Scope of Coverage**

  The scope of the GCL policy extends to "those sums that the insured becomes legally
obligated to pay as damages because of . . . 'property damage'" that is "caused by an
'occurrence.'" (Dkt. No. 2-2, p. 12). The term "occurrence" is further defined as "an accident,
including continuous or repeated exposure to substantially the same general harmful conditions."
*Id.* at 30. Under Utah law, when determining whether there is an accident, the court is not to
examine whether the underlying act is intentional, deliberate, or foreseeable, but rather whether
the result of the act was intended or expected from the perspective of the insured. *N.M. ex rel.
Caleb v. Daniel E.*, 2008 UT 1, ¶ 11, 175 P.3d 566 (Utah 2008); *see also Cincinnati Ins. Co. v.
AMSCO Windows,* No. 13-4155 and 13-4159, 2014 U.S. App. LEXIS 22492 (10th Cir. 2014).
Thus, harm or damage is not accidental if: (1) it is the result of actual design or intended by the
insured, or (2) it is the natural and probable consequence of the insured's act or should have been
expected by the insured. *Caleb*, 2008 UT at ¶ 7.

  Cincinnati argues in this case that there is no occurrence because the sole cause of the
property damage was Spectrum's own defective work. It acknowledges that there was substantial
damage to property, but argues that the damage was caused by a lack of meaningful supervision
on the project by Spectrum, whom the Arbitrator found allowed or encouraged defective or
substandard work. Cincinnati has made no allegations, however, that Spectrum intended the water
damage to the inside of the home and main deck, or the cracking in the basement slab.

  Moreover, because subcontractors are contractually required to correctly perform their

own work regardless of the type of supervision they receive, their negligent acts are neither something that is to be expected nor the natural and probable consequences of the way they are supervised. *See Great Am. Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 1281 (D. Utah, 2006) ("Given the Utah Supreme Court's focus on the acts of the insured when determining whether there has been an occurrence, it follows that the negligent acts of Woodside's subcontractors can be considered an occurrence from Woodside's 'point of view' . . . [*Hoffman v. Life Ins. Co.*, 669 P.2d 410, 416 (Utah 1983)]; *cf. O'shaughnessy v. Smuckler Corp.*, 543 N.W.2d 99, 103 (Minn. Ct. App. 1996) ('A general contractor has minimal control over the work of its subcontractors by definition.')"). Because there is no "but for" causation, given that a subcontractor can perform defective work even when dutifully supervised, and all the work in question was performed by Spectrum's subcontractors, the court finds there is an occurrence under Utah law.[3]

Cincinnati has conceded that the water damage to the deck and to the interior of the residence, as well as the cracking and heaving of the basement slab, constitutes 'property damage' as that term is defined in the policies. (Dkt. No. 80, p. 67). In light of this concession, the court finds that Ficeto has met his burden and has established a prima facie case that there was a covered occurrence. The sole question remaining is whether there are any applicable policy exclusions. Cincinnati has the burden of proving on summary judgment that as a matter of law the claimed damage is excluded under the policy language. It argues that coverage is excluded under exclusions j.5 and j.6—the court will analyze each in turn.

## B. Policy Exclusions

### 1. Exclusion j.5

Exclusion j.5 applies to "Property damage" to "That **particular part** of real property on

---

[3] At this time, the court makes no determination as to whether there was more than one occurrence.

which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, **if the 'property damage' arises out of those operations**." (Dkt. No. 2-2, p. 16) (emphasis added). The plain language of the exclusion restricts its scope to the specific part of the property on which operations are being performed. It is also quite clear that damage on that particular part must occur concurrent with the performance of the operation—which must be the cause of the harm—for it to be excluded.[4]  *See, e.g.*, *Midmountain Contractors, Inc. v. American Safety Indemnity Co.*, 893 F. Supp. 2d 1096, 1106 (W.D. Wash. 2012); *Columbia Mut. Ins. Co. v. Shauf*, 967 S.W.2d 74, 80–81 (Mo. 1998) ("The exclusion bars coverage for damage to 'that particular part of real property on which [the insured] *is performing operations*,' not on which the insured *did perform operations*, *will perform operations*, or *has contracted to perform operations*.") (emphasis in original).

A broadened endorsement modifies this exclusion such that it does "not apply to 'property damage' to the property of others described therein." (Dkt. No. 2-2, p. 42). However, it limits coverage to $5,000 for each occurrence. *Id*. Thus, the broadened endorsement provides coverage for damage to property owned by persons other than Spectrum. Since the damage claimed in this case was to the property of someone other than Spectrum, i.e. Ficeto, he could recover up to $5,000 under the endorsement for damage that would otherwise be barred under the j.5 exclusion,

---

[4]  This interpretation is supported by trade usage. The policies in question are copyrighted by the Insurance Services Office ("ISO"). Until 1985, standard CGL policies included a Work Performed Exclusion that "eliminated coverage for 'property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of the materials, parts or equipment furnished in connection therewith . . . .'" SCOTT C. TURNER, INSURANCE COVERAGE OF CONSTRUCTION DISPUTES §§ 29:2, 32:2 (2nd ed. 2014). In 1968 the Insurance Rating Board ("IRB"), a precursor to the ISO, introduced two new endorsements titled "Broad Form Property Damage Endorsement (Excluding Completed Operations)" and "Broad Form Property Damage Endorsement (Including Completed Operations). *Id.* Both contained the same exclusions applicable to the insured's ongoing work and included the Performing Operations Exclusion and the Faulty Workmanship/Incorrectly Performed Work Exclusion. *Id.* "Instead of the 'work performed' exclusion's blanket elimination of coverage for 'any portion' of the insured's on-going work, both of these two replacements exclusions only applied to 'that particular part' of the insured's on-going work that was bad. Thus, good parts of the insured's work damaged by the bad parts of its work were now covered." *Id.* In response to this expansion of coverage IRB recommended a 10% increase in premium policies. *Id.* The scope of coverage in exclusion j.5 and j.6 remain essentially the same. *Id.*

unless otherwise excepted by another exclusion. The court must now determine how the exclusion j.5 applies to the damages at issue in this case.

*Damage to Interior Walls and Floor.* The facts are undisputed that the water damage to the interior walls and flooring did not arise from any operations performed on those particular parts. That property damage arose from operations on the roof, where improper construction became a source of leaks, and operations on the main deck, where faulty waterproofing and incorrect installation of the scuppers resulted in leaks. The leaks were not caused by any work performed on the drywall or floors. Moreover, there are no allegations that the water damage occurred at the same time that any work was being performed on the drywall or floors. Thus, the court concludes that damage to the interior walls and flooring is not excluded under exclusion j.5. Damage to the interior walls and flooring below the main deck caused by defective work on the main deck is also not excluded for the same reason.

*Damage to the Main Deck.* The evidence is unclear as to when the water damage on the main deck started to occur. Bezzant testified that he observed water damage to the deck while it was being worked on, which he believed was a result of the improper installation of the scuppers. While any water damage to the main deck that occurred while work was being performed on it is limited to the $5,000 coverage under the endorsement, damage that occurred after the work on the deck was completed would fall outside the scope of exclusion j.5. Nevertheless, the court need not resolve this issue, including how much damage was caused by subsequent work, because all water damage on the main deck falls within exclusion j.6.

*Damage to the Basement Slab.* Any cracks in the basement slab that occurred while work was being performed on that part—which would include the actual pouring, subsequent trawling, and coverage with insulation blankets—would be limited by the endorsement to $5,000, unless

another exclusion applies. Any subsequent settling and cracking would not fall under the scope of this exclusion because work was no longer being performed on the basement slab. The applicability of exclusion j.5, however, is contingent on the damage being the result of those operations. Because there is a dispute, supported by evidence on both sides, as to whether the actual pouring was improperly done (see discussion under j.6), this issue cannot be resolved on summary judgment.

### 2. Exclusion j.6

Exclusion j.6 applies to "Property damage" to "That **particular part** of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (Dkt. No. 2-2, p. 16) (emphasis added). Like exclusion j.5, the language limiting the exclusion to 'that particular part' severely curtails the scope of this exclusion. That language is "trebly restrictive, straining to the point of awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally. . . . [T]hat 'part,' as used in this exclusion, means the 'distinct component parts' of a building—things like the 'interior drywall, stud framing, electrical wiring,' or . . . the foundation. The (j)(6) exclusion therefore applies only to the cost of repairing or replacing distinct component parts on which the insured performed defective work." *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 311 (6th Cir. 2010) (internal citations omitted); *see also Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 215 (5th Cir. 2009).[5]  The court must apply the exclusion to the facts in light of its restrictiveness.

*Damage to Interior Walls and Floor.* Although it is true that the damage to the walls and floors must be 'restored, repaired or replaced,' it is undisputed that the work on these particular parts was not incorrectly performed. Thus, damage to the walls and floors is not excluded under

---

[5]  *See supra* note 3.

exclusion j.6. This damage includes damage to walls and flooring that was caused by defective work on the main deck.

*Damage to the Main Deck.* The evidence supports a conclusion that the damage to the main deck occurred because work on all of its parts was incorrectly performed. Because of improper sloping of the deck, significant amounts of water did not drain to the scuppers. Moreover, the water that did drain towards the scuppers did not drain properly because the scuppers were not flashed correctly. (Campbell Dep. 46:13-48:11, Sept. 22, 2010) (Dkt. No. 67-3). Instead the undisputed evidence supports that the scuppers had just been slid in without any caulking after the concrete had been poured. (Bezzant Dep. 29:4-30:16, Jan. 10, 2013) (Dkt. No. 67-3). Similarly, the stone on the inside of the parapet wall, which had not been capped, was resting directly on the concrete without any flashing. (Campbell Dep. 45:13-46:6, 47:6-8, Sept. 22, 2010) (Dkt. No. 67-3). Ficeto has produced no evidence from which a fact finder could find to the contrary. Because the undisputed evidence supports that the damage to the deck was caused by faulty work to the deck itself, Cincinnati has met its burden and exclusion j.6 applies to except that damage.

*Damage to the Basement Slab.* Exclusion j.6 would apply to any cracks to the basement slab that resulted from incorrect pouring. However, if the causes of the cracking were errors in the preparation of the ground over which the slab was poured, which was separate work completed by a different subcontractor, the cracking would not be excluded. The evidence is in dispute on this issue. The arbitrator found that "[t]he slab has settled significantly, likely due to improper compaction and pouring the slab over damp, wet and/or frozen base fill." (Dkt. No. 67-2, p. 96). Because the house used radiant heat, the plumbing subcontractors prepared the in-floor system, installing bubble wrap insulation, wire mesh, and tying heating tube to the wire mesh prior to the

concrete being poured. (Bezzant Dep. 15:18-22, Jan. 10, 2013) (Dkt. No. 67-3). Thus, at the time Bezzant & Sons poured the concrete, no dirt was visible other than just the footings and the outside foundation. *Id.* at 15:23-25. Bezzant testified that "[w]hen we came to pour this basement floor, the excavator is responsible for compacting the dirt and it was totally prepared, ready to pour." *Id.* at 25:7-9.

If the concrete was poured directly over snow, however, it may support a finding that the concrete subcontractor's work was defective;[6] and if the cracking was caused by that defective work, the damage would be excluded under exclusion j.6. But if the actual pouring work was done properly and the cracking was the result of improper compaction by the excavation subcontractor, then this exclusion would not apply because no defective work would have been performed on that particular part, i.e. the concrete slab. Cincinnati has failed to produce undisputed evidence from which the court can decide as a matter of law the damage was caused by the defective pouring of the concrete. Moreover, some of the damage to the concrete slab may have been caused by defective work and the natural and probable consequences of that work, while other damage may have resulted from other causes. Separating the causes of damage and the cost necessary to repair that damage are issues of fact. Because this is a disputed issue of material fact, it cannot be resolved on summary judgment.

### 3. Products-Completed Operations Hazard

Exclusion j.6 does not apply to "'property damage' included in the 'products-completed operations hazard,'" which is defined as "'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: . . . Work that has not yet been completed or abandoned." (Dkt. No. 2-2, p. 30–31). "Your work" refers to the work of the

---

[6] There is a question as to whether rebar was required by any applicable building codes or by the building plans and specifications. If so, the lack of rebar may make the pouring defective if there were evidence that the lack of rebar caused the damage being claimed.

insured—Spectrum. Work is deemed completed "at the earliest of the following times: (a) When all of the work called for in your contract has been completed; or (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." *Id.* at 31.

The policy does not define the term "abandoned." Ficeto concedes that Spectrum's work was not completed, but argues that the termination constituted abandonment. It is undisputed that Ficeto fired Spectrum on January 7, 2009, and Spectrum at least asserts that it was willing to complete the work. While the term abandonment has some ambiguity with regards to whether it requires a unilateral decision by the insured or mutual action taken by both parties to the contract, several courts have held that it does not encompass the unilateral termination of an insured by the other party. *See, e.g.*, *Hubbell v. Carney Bros. Constr.*, No. 05-cv-00026-CMA-KLM, 2013 U.S. Dist. LEXIS 68331, *21 (D. Colo., May 14, 2013) (No abandonment where "the stipulated facts only support a finding that the Carney Defendants stopped working once Plaintiff's terminated their contract."); *Claredon America Ins. Co. v. General Security Indemnity Co. of Arizona*, 193 Cal. App. 4th 1311, 1319 (2011) ("Hilmor's work had not been . . . abandoned. Instead, Hilmor was terminated from the job before it completed its work.").

Ficeto relies on *Midmountain Contractors Inc. v. American Safety Indemnity Co.* to argue that Spectrums performance was so inadequate that it should be viewed effectively as an abandonment because Ficeto had no realistic choice but to terminate the contract to prevent further damage to his property. 893 F. Supp. 2d 1096 (W.D. Wash. 2012). *Midmountain* does not support Ficeto's argument. In that case the court found abandonment on the basis that the insured

14

refused to complete its work and walked off the project. 893 F. Supp. 2d at 1103, 1108 ("[T]he term 'abandon' . . . require[s] only that the insured 'abandon' its work."). Although in an appropriate case the contractor could be found to have engaged in conduct, such as a slow-down, that could be deemed to be a constructive abandonment of the work, this is not such a case. Given that the sole reason Spectrum ceased work on the project was involuntary and out of its control, the court concludes that there was no abandonment. In any case, the products-completed operations hazard has no application to any property damage that took place prior to the date of Spectrum's termination because it does not cover work that '*has not yet been*' abandoned.

**V. Umbrella Policy**

Ficeto also contends that the arbitrator's damage award is covered under the Umbrella policy, which offers coverage for "the 'ultimate net loss' which the insured is legally obligated to pay as damages for . . . 'property damage' . . . a. Which is in excess of the 'underlying insurance'; or b. Which is either excluded or not insured by 'underlying insurance.'" (Dkt. No. 2-2, p. 147). The Umbrella policy only applies, however, if, prior to the coverage term in which the damage occurs, "you did not know . . . that the . . . 'property damage' had occurred or had begun to occur, in whole or in part." *Id.* Again, the "you" refers to Spectrum as the insured. The policy became effective on February 10, 2009. Thus, the question presented is whether and when Spectrum knew the damage had occurred or begun to occur prior to that date. Under the policy, a party is deemed to know that property damage has occurred when any authorized representative "c. First observes, or reasonably should have first observed, the . . . 'property damage,' or . . . d. Becomes aware, or reasonably should have become aware, by any means . . . that 'property damage' had occurred or had begun to occur." *Id.* Because damage to the interior walls and flooring is covered under the GCL, the court need only address whether there is coverage under the Umbrella policy for

damage to the main deck and the basement slab.

*Damage to the Main Deck.* Garry Bezzant, the concrete subcontractor, testified that he had observed damage to the main deck as early as October 2008. (Bezzant Dep. 30:10-16, 32:10-21, Jan. 10, 2013) (Dkt. No. 67-3). That testimony is undisputed. Bezzant may not have been an authorized representative of Spectrum, but his testimony is evidence of what Spectrum could have observed had it provided reasonable supervision. Similarly, Campbell, who replaced Spectrum, testified that he observed the water damage to the deck and the interior of the home on his first day on the job, January 12, 2009—only five days after Spectrum was terminated on January 7, 2009. (Campbell Dep. 42:12-21, 43:5-20, 44:5-8, 45:22-46:6, Sept. 22, 2010) (Dkt. No.67-3). The description of the damage at that point—walls so damp as to have already started to rot, icicles eight to twelve feet in diameter and ten to twelve feet long hanging from below the arches and beginning from within the rock, and the wall underneath the cap also beginning to rot—supports an inference that Spectrum should have reasonably been aware of the damage by the time it was removed from the project. *Id.*

Ficeto contends that this inference cannot support summary judgment, arguing there is a disputed issue of fact because the Burninghams' prior deposition testimony contradicts Paul Burningham's recent affidavit that he knew of the damage. (Dkt. No. 78, p. 69–71). As to the damage to the deck, the testimony by Bezzant and Campbell is undisputed that they observed the damage. In the face of that testimony, the fact finder could not reasonably conclude that Spectrum should not have known of the damage, even if the testimony of the Burninghams is completely disregarded. Spectrum had responsibility to have personnel on site to supervise the work. The fact that the subcontractor saw evidence of damage while Spectrum was still on site and that the replacement contractor saw damage within a few days of Spectrum being removed from the site

16

leaves the conclusion factually indisputable that Spectrum, had it been doing its job, should have discovered the damage.

*Damage to the Basement Slab.* The same conclusion, however, cannot be reached for the basement slab. It is undisputed that cracking was apparent within a few days after the concrete was poured and that the cracks continually worsened throughout Spectrum's time on the project. On that basis Cincinnati argues that the **sole** cause of all the cracks was that the concrete was poured over frozen and improperly compacted ground. Ficeto disagrees and maintains that the new cracks observed in March or April 2009 were the result of the spring runoff flowing under the slab due to inadequate drainage—something that was not discovered until a plumber broke a hole into the concrete after the Umbrella policy was in effect. Because there are disputed issues of material fact, this issue cannot be resolved by summary judgment. To the extent Ficeto is able to distinguish at trial damage caused by spring runoff from damage caused by defective work by Spectrum or its subcontractors, the causes would be separate "occurrences." Damage proven to have been caused by an occurrence that took place within the effective dates of the Umbrella coverage would be covered.

## CONCLUSION

In summary, Cincinnati is entitled to partial summary judgment that it has no liability under the GCL policy or the Umbrella policy for any liability of Spectrum for damage to the main deck. Summary judgment in favor of Cincinnati, however, must be denied as to whether there is coverage for damage to the basement slab. There are disputed issues of fact that must be resolved at trial as to the causes of damage to the slab and the amount of damage that can be attributed to those causes. Finally, Ficeto is entitled to partial summary judgment that Cincinnati is liable under the GCL policy for damage caused to the interior walls and flooring by the defective work

of Spectrum and its subcontractors on other parts of the building. A disputed issue of fact remains for trial as to the amount of damage attributable to repairing the interior walls and flooring. Consistent with the foregoing analysis, the court orders as follows:

1. GRANTS in part and DENIES in part Cincinnati's Motion for Partial Summary Judgment, (Dkt. No. 67);

2. GRANTS in part and DENIES in part Cincinnati's Objection, (Dkt. No. 81);

3. GRANTS in part and DENIES in part Ficeto's Cross-Motion for Partial Summary Judgment, (Dkt. No. 69); and

4. DENIES AS MOOT Ficeto's Motion to Strike (Dkt. No. 82).

SO ORDERED this 18th day of February, 2015.

BY THE COURT:

Clark Waddoups
United States District Court Judge